FILED
2021 MAR 5 PM 1:56
CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| NATHAN W., individually and on behalf of B.W., a minor,<br><br>    Plaintiffs,<br><br>v.<br><br>ANTHEM BLUECROSS BLUESHIELD OF WISCONSIN, *et al.*,<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' PARTIAL MOTION TO DISMISS**<br><br>Case No. 2:20-cv-00122-JNP-JCB<br><br>District Judge Jill N. Parrish |

Defendants Blue Cross Blue Shield of Wisconsin, doing business as Anthem Blue Cross and Blue Shield ("Anthem"), Aurora Health Care, Inc. ("Aurora"), and Advocate Aurora Health Care, Inc. Health and Welfare Plan (collectively, "Defendants") bring this Partial Motion to Dismiss Plaintiffs' Second Cause of Action for violation of the Mental Health Parity and Addiction Equity Act of 2008 (the "Parity Act"), an amendment to ERISA codified at 29 U.S.C. § 1185a and enforced through 29 U.S.C. § 1132(a)(3). ECF. No. 9. For the following reasons, the court denies Defendants' Partial Motion to Dismiss.

## BACKGROUND

The Advocate Aurora Health Care, Inc. Health and Welfare Plan (the "Plan") is a self-funded employee welfare benefits plan subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Anthem is a member of the Blue Cross Blue Shield network of providers and was the third-party claims administrator for the Plan. Aurora primarily

handled all claims and appeals associated with this case. Nathan and his son, B.W. (collectively, "Plaintiffs"), were and continue to be Plan participants and beneficiaries.

## I.     B.W.'s Behavioral History and Outpatient Care

From an early age, B.W. has received therapy for concerning behavior. When he was five years old, B.W. lost all contact with his biological father and began to say that he wanted to kill himself when he became angry. He was taken to therapy and given a psychological evaluation. B.W.'s therapist advised that he continue to be monitored. B.W. and his family moved to Wisconsin, and Nathan eventually formally adopted B.W.

In school, B.W. struggled to make and keep friends and was physically and verbally aggressive with other students when playing sports. B.W. would also cry easily when frustrated and would often slam his bedroom door, pull his hair, and scratch his face and pick at his skin when anxious. In one fit of rage, B.W. carved deep gouges in his bedframe. This fit prompted B.W. to resume outpatient therapy. After a neuropsychological evaluation at the recommendation of his pediatrician, B.W. was diagnosed with severe attention deficit hyperactivity disorder with a high anxiety component and began taking medication.

B.W. attended a new school but was bullied in-person and online. He felt unsafe at school and transferred to a different school. An attempt to homeschool B.W. failed because of his resistance to the instruction. B.W. also continued to exhibit severe mood swings, anxiety, and behavioral issues during this time and continued to work with a variety of mental health outpatient treatment providers. B.W. again threatened suicide. Police were called but determined that B.W. did not pose an imminent threat to his own safety and that he should remain home with supervision.

B.W. was later transferred to a private catholic school, where he would often fake injuries for attention. His academic performance was also poor. In another neuropsychological exam, B.W.

performed exceptionally poorly in short-term recall, at a level equivalent to that of an individual who had suffered from a traumatic brain injury. B.W. began refusing to take his medications, stealing from others, vaping an unknown substance, experiencing heightened depression and anxiety, and making concerning statements like, "maybe I just won't be here anymore." B.W. also behaved inappropriately toward girls, often soliciting nude photos and then lying about his behavior. B.W. was suspended from school for three days for insubordination, and, upon his return, was reported for allegedly providing a vaping device to another student. In response, B.W. threatened that he would "find the snitch and put a bullet in his head." The school told Nathan that B.W. was considered a high-risk individual and thus had two options: either voluntarily withdraw from the school, or be expelled. B.W. chose the former.

## II.     Denial of Coverage for Elevations Treatment

When outpatient intervention proved to be unsuccessful and B.W.'s behavior worsened, he was admitted to Elevations Residential Treatment Center ("Elevations"). Elevations is a licensed treatment facility located in Utah that provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. B.W. received medical care and treatment at Elevations from January 21, 2019 to March 27, 2019.

On January 23, 2019, Nathan received a letter from Aurora informing him that, based on an evaluation from external reviewer AllMed, coverage for B.W.'s treatment at Elevations would be denied. Aurora explained that it did not appear that B.W. had tried lower levels of care, such as an intensive outpatient program ("IOP") or a partial hospitalization program ("PHP"), or that there

was imminent harm necessitating residential care. Accordingly, Aurora wrote[1] that B.W. "can be appropriately managed at a lower level of care," and "[t]he requested level of care is not identified to be medically necessary at this time." ECF No. 2 ¶ 21.

Nathan appealed this denial on April 23, 2019. Nathan objected that he had not been given the copy of the reviewer report that he had requested and argued that Aurora's guidelines violated generally accepted standards of medical practice by requiring patients to exhibit acute psychiatric symptoms to qualify for sub-acute care. Nathan also objected to Aurora's "fail-first" protocol, which required B.W. to first attempt a lower level of treatment before attempting residential treatment. Citing the Parity Act, Nathan argued that the denial amounted to a non-quantitative treatment limitation, that Aurora did not require the acute or "fail-first" criteria for analogous medical/surgical care at skilled nursing facilities and inpatient rehabilitation centers, and so Aurora therefore could not impose such requirements on intermediate level mental health treatment programs. Moreover, Nathan argued that B.W.'s treatment met the definition of medical necessity as defined by the Plan based on his continued behavioral struggles and discharge summary from Elevations. Nathan also stated that Elevations was the most cost-effective option for the level of care that B.W. needed and was necessary to prevent further escalation of B.W.'s behaviors and more intensive treatment in the future. If the denial was upheld, Nathan requested that he be provided with "a copy of the documents under which the Plan was operated, including the specific reasons for the determination, any corresponding supporting evidence, any administrative service

---

[1] In deciding a motion to dismiss for failure to state a claim, the court may consider "documents that are referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (citation omitted). For these reasons, the court considers the benefits denial correspondence excerpted by Plaintiffs in deciding the pending motion.

agreements that existed, any clinical guidelines or medical necessity used to evaluate the claim, the Plan's criteria for skilled nursing, hospice, and inpatient rehabilitation facilities, and any report from any physician or other professional concerning the claim" (collectively, the "Plan Documents"). ECF No. 2 ¶ 30.

Following an independent review organization's evaluation of Nathan's appeal, Aurora upheld the denial of coverage for B.W.'s treatment. The organization found that B.W.'s treatment at Elevations was not medically necessary because there was a "lack of evidence of symptom severity at the time of admission that would require the use of residential treatment in a 24 hour a day setting." ECF No. 2 ¶ 32. The organization also stated that there was "a lack of detail" as to whether B.W.'s reported symptoms were present at the time of or immediately preceding his admission to Elevations. *Id.* In particular, the organization concluded that there was "no indication of ongoing plans or intent to harm others," B.W.'s "level of impulsivity appears to be of moderate level," there was "no current history of significant aggression or other inappropriate behaviors of a severity that would require observation and treatment around the clock," and there was "no evidence of severe depression or anxiety, and no evidence of recent deterioration of functioning." *Id.* For these reasons, the organization found that "the recommended level of care would be either [IOP] or [PHP]." *Id.* ¶ 31.

### III.     Denial of Coverage for DRA Treatment

On March 27, 2019, B.W. began treatment at Diamond Ranch Academy ("DRA"). Like Elevations, DRA is a licensed treatment facility located in Utah that provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems. As it did with Elevations, Aurora denied coverage for B.W.'s treatment at DRA. In its April 17, 2019 denial letter, Aurora stated that two unidentified external reviewers found that B.W.'s treatment

"did not require 24 hour residential level of care intensity" and "medical necessity is not met." ECF No. 2 ¶ 34. These findings were based on B.W.'s denial of suicidal and homicidal ideation; lack of self-harming, physical aggression, psychosis, or comorbid substance abuse; medical stability and toleration of medications; and capability of accomplishing daily living activities.

Nathan appealed Aurora's denial on August 9, 2019. Nathan objected that the letter did not specify dates of service that were denied or identify the reviewers, nor had he been provided with a copy of the reviewers' report. As with his previous appeal, Nathan argued that Aurora was requiring patients to exhibit acute psychiatric symptoms to qualify for sub-acute mental health care in violation of generally accepted standards of medical practice. Nathan averred that this amounted to a nonquantitative treatment limitation, as similar requirements were not imposed on sub-acute medical services such as skilled nursing care. Nathan again argued that B.W.'s treatment met the requirements for medical necessity.

On September 12, 2019, Aurora upheld its denial. Aurora found that the medical necessity requirement was not met. Aurora quoted an excerpt from the Medically Necessary or Medical Necessity portion of the summary plan description and concluded that "[t]he recommended level of care would be either [IOP] or [PHP]." ECF No. 2 ¶ 39. An external review report from Prest & Associates, LLC found that medical necessity was not met for the following reasons:

1. There is no danger to self or others. There is no suicidal ideation, homicidal ideation, or self-harm behavior. There is no aggressive behavior toward self or others.
2. There are no acute medical symptoms or acute psychiatric symptoms requiring monitoring in a 24-hour setting. There is no active substance use condition complicating treatment.
3. The patient exhibited some social impairment, difficulty with moral reasoning and judgment, as well as problems with accountability, family interactions, and self-awareness. However, the patient was able to access support with participating in programming. His family was involved in

6

> treatment. Continued treatment, including individual therapy, family therapy, social thinking, consideration of attachments, and consideration of Multisystemic Therapy (MST) could safely and adequately be addressed in a less restrictive setting, such as consideration of a mental health partial hospitalization or intensive outpatient program.

*Id.* ¶ 40.

As a result of Aurora's coverage denials, Nathan incurred medical expenses in excess of $100,000. And, despite Nathan's requests, Anthem has still failed to produce copies of the Plan Documents, "including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities." ECF No. 2 ¶ 43.

## IV.    Plaintiffs' Claims

Having exhausted their pre-litigation appeal obligations under the Plan and ERISA, Plaintiffs filed their Complaint on February 24, 2020, asserting two causes of action: (1) recovery of benefits under 29 U.S.C. § 1132(a)(1)(B); and (2) violation of the Parity Act under 29 U.S.C. § 1132(a)(3). As part of their Parity Act claim, Plaintiffs allege that the Plan's medical necessity criteria for intermediate level mental health treatment benefits are more stringent than the medical necessity criteria the Plan applies to intermediate level medical or surgical benefits. Plaintiffs identify medical/surgical treatment analogues that are covered by the Plan (sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities) and allege that Anthem does not restrict coverage for these analogues "based on medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner Anthem excluded coverage of treatment for B.[W.] at Elevations and DRA." ECF No. 2 ¶ 54.

Specifically, Plaintiffs allege that Anthem's reviewers improperly used acute medical necessity criteria—such as requiring suicidal or homicidal ideation or "acute psychiatric

symptoms"—to evaluate the non-acute treatment that B.W. received. In contrast, the Plan does not use acute medical necessity criteria to evaluate analogous sub-acute inpatient medical/surgical care.[2] Plaintiffs argue that Defendants' conduct amounts to a disparity in treatment limitations between mental health care coverage and analogous medical/surgical care. On May 4, 2020, Defendants moved to dismiss Plaintiffs' second cause of action under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs failed to state a claim for violation of the Parity Act.

## LEGAL STANDARD

Dismissal of a claim under Federal Rule of Civil Procedure 12(b)(6) is appropriate where the plaintiff fails to "state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss for failure to state a claim, a court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The complaint must allege more than labels or legal conclusions, and its factual allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

---

[2] Plaintiffs also allege that the Plan improperly relied on the involvement of B.W.'s family in his treatment and imposed a "fail-first" requirement in denying coverage. ECF No. 2 ¶¶ 57–58. Because the court ultimately finds that Plaintiffs have plausibly alleged a Parity Act claim based on Defendants' use of acute medical necessity criteria in evaluating sub-acute mental health care, the court does not evaluate Plaintiffs' allegations related to B.W.'s family involvement and the "fail-first" requirement.

**DISCUSSION**

Defendants contend that Plaintiffs fail to state a Parity Act claim. Under a three-part Parity Act claim test, Defendants argue that Plaintiffs failed to satisfy the first and third elements of the test. That is, Defendants argue that Plaintiffs' Parity Act claim should be dismissed because they failed to "identify a specific treatment limitation on mental health benefits," and "plausibly allege a disparity between the treatment limitation on mental health/substance abuse benefits as compared to the limitations that defendants would apply to the covered medical/surgical analog." ECF No. 9 at 8 (citation omitted). Plaintiffs respond that they have adequately pleaded a Parity Act violation because they have alleged that Anthem imposed treatment limitations on B.W.'s mental health care and that the same limitations are not applied to analogous medical/surgical care.

## I.     The Parity Act

The Parity Act is an amendment to ERISA enforceable through a cause of action under 29 U.S.C. § 1132(a)(3). *Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1259 n.118 (D. Utah 2016). "The Parity Act was passed to prevent insurance providers' disparate treatment of 'mental health and substance use disorders as compared to . . . medical and surgical conditions.'" *David S. v. United Healthcare Ins. Co.*, No. 2:18-CV-803, 2019 WL 4393341, at *3 (D. Utah Sept. 13, 2019) (unpublished) (citation omitted); *see also Munnelly v. Fordham Univ. Faculty*, 316 F. Supp. 3d 714, 728 (S.D.N.Y. 2018) ("Essentially, the Parity Act requires ERISA plans to treat sickness of the mind in the same way that they would a broken bone.").

The Parity Act provides:

> In the case of a group health plan (or health insurance coverage offered in connection with such a plan) that provides both medical and surgical benefits and mental health or substance use disorder benefits, such plan or coverage shall ensure that -- . . . the treatment limitations applicable to such mental health or substance use

9

> disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage) and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits.

29 U.S.C. § 1185a(a)(3)(A)(ii). "Treatment limitations" under the Parity Act include "both quantitative treatment limitations, which are expressed numerically (such as 50 outpatient visits per year), and nonquantitative treatment limitations, which otherwise limit the scope or duration of benefits for treatment under a plan or coverage." 29 C.F.R. § 2590.712(a)*; see also* 29 U.S.C. § 1185a(a)(3)(B)(iii) (defining "treatment limitations"). Examples of nonquantitative treatment limitations include "restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope and duration of benefits for services provided under the plan or coverage." 29 C.F.R. § 2590.712(c)(4)(ii)(H). And, with respect to mental health coverage, the Parity Act's implementing regulations provide that:

> [a] group health plan (or health insurance coverage) may not impose a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits in any classification unless, under the terms of the plan (or health insurance coverage) as written and in operation, any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification.

*Id.* § 2590.712(c)(4)(i).

"An insurance provider violates the Parity Act by using a nonquantitative limitation for mental health treatment that is more restrictive than the nonquantitative limitation applied to medical health treatments." *David S.*, 2019 WL 4393341, at *3 (citations omitted). Providers can therefore violate the Parity Act in two ways: "facially, by writing an offending treatment limitation

into the plan; and in application, by applying an offending treatment limitation to deny coverage." *Id.* (citations omitted). "To sufficiently plead a facial claim, the plaintiff 'must correctly identify [the plan's express] limitation and compare it to a relevant analogue.'" *Jeff N. v. United HealthCare Ins. Co.*, No. 2:18-CV-710, 2019 WL 4736920, at *3 (D. Utah Sept. 27, 2019) (unpublished) (citation omitted). "To state a plausible claim under [an as-applied] theory, a plaintiff may allege that a defendant differentially applies a facially neutral plan." *Id.* at *4 (citation omitted). "[A]t the very least, a plaintiff must identify the treatments in the medical [or] surgical arena that are analogous to the sought-after mental health [or] substance abuse benefit and allege that there is a disparity in their limitation criteria." *Id.* (citation omitted).

## II.   Alleging a Parity Act Claim

Defendants articulate a three-part test to state a claim for a Parity Act violation:

> Parity Act plaintiffs must (1) identify a specific treatment limitation on mental health benefits; (2) identify medical/surgical care covered by the plan that is analogous to the mental health/substance abuse care for which the plaintiffs seek benefits; and (3) plausibly allege a disparity between the treatment limitation on mental health/substance abuse benefits as compared to the limitations that defendants would apply to the covered medical/surgical analog.

*Johnathan Z. v. Oxford Health Plans*, No. 2:18-CV-383, 2020 WL 607896, at *13 (D. Utah. Feb. 7, 2020) (unpublished) (citation omitted). Plaintiffs do not object to this formulation.

"[T]here is no clear law on what is required to state a claim for a Parity Act violation." *Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1174 (D. Utah 2019). Although a four-part test[3] has been applied to Parity Act claims within the Tenth Circuit, this court

---

[3] The four-part test for a Parity Act claim is frequently articulated as follows:
> To state a Parity Act violation, a plaintiff must show that: (1) the relevant group health plan is subject to the Parity Act; (2) the plan

previously has observed that the four-part test and the three-part test are "materially indistinguishable, prompting only slightly different versions of the same basic question" of whether "the ERISA plan or the claims administrator treated benefits determinations for mental health/substance abuse care less favorably than the plan or the claims administrator treats benefits determinations for analogous, covered medical/surgical care." *Johnathan Z.*, 2020 WL 607896, at *13 n.9. Thus, the three-part test "may be preferred going forward." *Id.*

Because the four-part and the three-part tests invoke the same essential inquiry and Plaintiffs have not objected to the three-part test, the court will apply the three-part test in evaluating Plaintiffs' Complaint. Because Defendants concede that Plaintiffs have satisfied the second element of the test (ECF No. 9 at 8), the court considers only whether Plaintiffs have adequately pleaded facts to satisfy the first and third elements of the test. As set forth in the following analysis, the court finds that Plaintiffs' allegations satisfy both elements.

## III.   Element 1: Plaintiffs Have Identified a Specific Treatment Limitation on Mental Health Benefits

To state a Parity Act claim, a plaintiff must first identify a specific treatment limitation on the mental health care received. *David P. v. United Healthcare Ins. Co.*, No. 2:19-CV-225, 2020 WL 607620, at *16 (D. Utah Feb. 7, 2020) (unpublished). Defendants argue that Plaintiffs' Parity

---

provides both medical/surgical benefits and mental health or substance use disorder benefits; (3) the plan includes a treatment limitation for mental health or substance use disorder benefits that is more restrictive than medical/surgical benefits; and (4) the mental health or substance use disorder benefit being limited is in the same classification as the medical/surgical benefit to which it is being compared.

*Michael D.*, 369 F. Supp. 3d at 1174.

Act claim should be dismissed because Plaintiffs fail to quote or paraphrase "any Plan terms to support their allegations—nor can they." ECF No. 9 at 10–11. And, even if Plaintiffs are making an as-applied challenge, Defendants cite to decisions from other districts and argue that Plaintiffs still must identify the relevant treatment limitation in the Plan terms or the administrative record. They argue that Plaintiffs have failed to do so, and thus any facial or as-applied challenge fails. Plaintiffs respond that they addressed Anthem's duty under the Plan terms in paragraphs 23 and 24 of their Complaint, quoted or paraphrased portions of the "medical necessity" definition in the summary plan description in paragraph 26, and quoted the full Plan definition of "medical necessity" in paragraph 39. Plaintiffs state that they are raising an as-applied challenge under the Parity Act and cite to *David P.* as support that they sufficiently alleged an as-applied challenge.

In *David P.*, defendants argued that plaintiffs had failed to allege the first element of a Parity Act claim because they "[did] not identify any Plan terms to support their allegations—nor can they." 2020 WL 607620, at *16. However, this court noted that, "[u]nder Parity Act regulations and a long list of this court's prior decisions, Plaintiffs do not need to identify a specific unequal limitation in the terms of their benefits and can pursue 'as-applied' challenges. *Id.* (citing 29 C.F.R. § 2590.712(c)(4)(i)). All plaintiffs must do is "demonstrate that the Defendants imposed 'a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits . . . under the terms of the plan (or health insurance coverage) as written *and in operation*' through 'any processes, strategies, evidentiary standards, or other factors' that '*are applied* . . . more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits.'" *Id.* (quoting 29 C.F.R. § 2590.712(c)(4)(i)). This court concluded that plaintiffs had sufficiently identified a specific treatment limitation on mental health/substance abuse benefits when they "plausibly allege[d] that

[defendant] applied its facially neutral medical necessity requirements in a way that required them to 'satisfy *acute care* medical necessity criteria in order to obtain coverage for residential treatment' for the *subacute* mental health/substance abuse care . . . received." *Id.* Further, the plaintiffs had alleged that, in denying benefits, defendants' "reviewers stated that residential treatment center care was not medically necessary . . . in part because [the plaintiff] 'did not want to hurt herself,' 'did not want to hurt others,' and she was 'not having any serious mental health issues.'" *Id.*

As it did in *David P.*, the court finds that Plaintiffs have pleaded sufficient facts to identify a specific treatment limitation on the mental health care that B.W. received. Like the plaintiffs in *David P.*, Plaintiffs have made an as-applied Parity Act challenge and have plausibly alleged that Defendants applied more stringent criteria in denying benefits for B.W.'s care at mental health/substance abuse residential centers than they would have applied had B.W. sought analogous medical/surgical care. Specifically, Plaintiffs have alleged that "Anthem's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that B.[W.] received." ECF No. 2 ¶ 55. Plaintiffs have also alleged that Defendants denied coverage of B.W.'s residential treatment at Elevations and DRA because Defendants' reviewers found that such treatment was not medically necessary due in part to the absence of suicidal and homicidal ideation, self-harming, physical aggression, or danger to self or others on the part of B.W. Essentially identical allegations were sufficient in *David P.* to satisfy the first element of a Parity Act claim, and the same is true here.

IV.     **Element 3: Plaintiffs Have Plausibly Alleged a Disparity Between Treatment Limitations on Mental Health/Substance Abuse Benefits and the Medical/Surgical Analog**

To satisfy the third element of a Parity Act claim, a plaintiff "must plausibly allege a disparity between the specified treatment limitation applied to the mental health/substance abuse services for which they sought benefits as compared to the treatment limitations applied to the covered medical/surgical analog." *David P.*, 2020 WL 607620, at *17 (citation omitted). Additionally, to state a plausible Parity Act claim, "a plaintiff need only plead as much of [his] prima facie case as possible based on the information in [his] possession." *Timothy D. v. Aetna Health & Life Ins. Co.*, No. 2:18-CV-753, 2019 WL 2493449, at *3 (D. Utah June 14, 2019) (unpublished) (citation omitted). This is because "[t]he nature of Parity Act claims is that they generally require further discovery to evaluate whether there is a disparity between the availability of treatments for mental health and substance abuse disorders and treatment for medical/surgical conditions." *Id.* at *4. Thus, "[c]ourts in this jurisdiction favor permitting Parity Act claims to proceed to discovery to obtain evidence regarding a properly pleaded coverage disparity." *Michael W. v. United Behavioral Health*, 420 F. Supp. 3d 1207, 1235 (D. Utah 2019).

Defendants argue that Plaintiffs fail to allege a coverage disparity because Plaintiffs only make insufficient, conclusory allegations comparing the treatment limitations imposed on the mental health/substance abuse care that B.W. received and those imposed on the medical/surgical analog. Plaintiffs respond that they did allege a coverage disparity: acute criteria were applied to coverage for sub-acute mental health/substance abuse care, while acute criteria were not applied to coverage of sub-acute medical/surgical care (e.g., in a skilled nursing facility or rehabilitation center). Plaintiffs also allege that Defendants "failed to produce a copy of the Plan Documents,

15

including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of Nathan's requests." ECF No. 2 ¶ 43.

The court finds that Plaintiffs' allegations of a coverage disparity are sufficient to satisfy the third element of a Parity Act claim. Plaintiffs explicitly allege that Defendants used acute medical necessity criteria to evaluate the non-acute mental health/substance abuse treatment that B.W. received, when"[t]he Plan does not require individuals receiving treatment at sub-acute facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive plan benefits." ECF No. 2 ¶ 55. Plaintiffs identified "skilled nursing facilities, inpatient hospice care, and rehabilitation facilities" as sub-acute medical/surgical analogs to the mental health care that B.W. received. *Id.* ¶ 54. Thus, Plaintiffs have plausibly alleged a coverage disparity: Defendants' criteria for B.W.'s sub-acute mental health residential care amounts to a more stringent treatment limitation than Defendants apply to analogous sub-acute medical/surgical care. *See Michael W.*, 410 F. Supp. 3d at 1237 (denying motion to dismiss when plaintiffs alleged that defendant's use of acute-level medical necessity criteria to evaluate sub-acute mental health residential treatment care was a more stringent treatment limitation than defendant used for analogous medical/surgical care at skilled nursing facilities, inpatient hospice care, and rehabilitation facilities); *Daniel R. v. UMR*, No. 2:19-CV-69, 2020 WL 1188144, at *7–8 (D. Utah Mar. 12, 2020) (unpublished) (denying motion to dismiss when plaintiffs alleged that defendants "applied more stringent acute treatment limitations to [plaintiff's] claims for sub-acute mental health and substance abuse treatment than [defendants] would have applied to sub-acute treatment at a skilled nursing or rehabilitation facility"); *David S.*, 2020 WL 4393341, at *4 (unpublished) (same).

Additionally, the court does not find that Plaintiffs' inability to provide specific documentation or more detailed factual allegations regarding the disparity in treatment limitations warrants dismissal at this stage. "[T]he Parity Act analysis 'counsels against a rigid pleading standard' because of the discrepancy in information between plaintiffs and defendants, particularly related to the treatment limitations that insurers apply to analogous medical/surgical care when the insureds did not receive that care." *Johnathan Z.*, 2020 WL 607896, at *19 (citation omitted). Indeed, "[t]he nature of Parity Act claims is that they generally require further discovery to evaluate whether there is a disparity between the availability of treatments for mental health and substance abuse disorders and treatment for medical/surgical conditions." *Timothy D.*, 2019 WL 2493449, at *4; *see also M. v. United Behavioral Health*, No. 2:18-CV-808, 2020 WL 5107634, at *3 (D. Utah Aug. 31, 2020) (unpublished) ("Discovery is necessary when the plaintiffs allege an as-applied violation of the Parity Act[.]"). During the administrative process, Plaintiffs requested documentation from Defendants that would have provided the information required to state their claims with more specificity, but Defendants failed to provide it. The court will not hold Plaintiffs responsible for documents and information that remain within Defendants' exclusive control. *See Kurt W. United Healthcare Ins. Co.*, No. 2:19-CV-223, 2019 WL 6790823, at *6 (D. Utah Dec. 12, 2019) (unpublished) ("Plaintiffs cannot be expected to plead facts that are in the possession of Defendants, and they will certainly not be punished for not offering those facts when their repeated requests to learn the same have been ignored."). The court finds that Plaintiffs have "adequately alleged a treatment limitation disparity based on the available information at this stage," *Nancy S. v. Anthem Blue Cross & Blue Shield*, No. 2:19-CV-231, 2020 WL 2736023, at *5 (D. Utah May 26, 2020) (unpublished), and accordingly denies Defendants' Partial Motion to Dismiss.

17

## CONCLUSION AND ORDER

For the foregoing reasons, the court finds that Plaintiffs have plausibly and sufficiently alleged a Parity Act claim. Thus, Defendants' Partial Motion to Dismiss (ECF No. 9) is hereby DENIED.


DATED March 5, 2021.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge